IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TASHA LeBRON, *o/b/o* R.L., | ) ) ) | CASE NO.  1:13-CV-1355 |
| Plaintiff, | ) ) | |
| v. | ) ) ) | MAGISTRATE JUDGE KENNETH S. McHARGH |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 14).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security  (the "Commissioner") denying Tasha LeBron's ("Plaintiff") application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.*, on behalf of R.L., is supported by substantial evidence and therefore, conclusive.

For the reasons set forth below, the undersigned AFFIRMS the Commissioner's decision.

## I.  INTRODUCTION & PROCEDURAL HISTORY

On May 4, 2010, Plaintiff applied for Supplemental Security Income benefits on behalf of R.L. (Tr. 104-07).  Plaintiff alleged R.L. became disabled on February 1, 2010, due to suffering from attention deficit hyperactivity disorder ("ADHD"). (Tr. 127).  The Social Security Administration denied the application initially and upon reconsideration. (Tr. 64-66, 70-72).  Thereafter, Plaintiff requested and was granted a hearing before an administrative law judge ("ALJ") to contest the denial of the application for benefits.  (Tr. 73).

On November 10, 2011, Administrative Law Judge Daniel Dadabo convened a hearing to evaluate the application. (Tr. 35-61).  Plaintiff and R.L., along with counsel, appeared before the

1

ALJ and testified. (*Id.*).  On March 5, 2012, the ALJ issued an unfavorable decision denying Plaintiff's request for benefits. (Tr. 11-23).

Subsequently, Plaintiff sought review of the ALJ's decision from the Appeals Council. (Tr. 6).  The Appeals Council denied Plaintiff's request, thereby making the ALJ's March 5, 2012 decision the final decision of the Commissioner. (Tr. 1-3).  Plaintiff now seeks judicial review of the Commissioner's denial pursuant to 42 U.S.C. § 1383(c).

### III.  EVIDENCE

#### A.  Personal background information

R.L. was born on June 1, 2002, making him nine years old and in the fourth grade at the time of the ALJ's determination. (Tr. 43).  Accordingly, when the ALJ rendered his decision, R.L. was a "school-age child" for social security purposes. *See* 20 C.F.R. 416.926a(g)(2)(iv).

#### B.  Educational records and medical evidence

In January 2010, when R.L. was in the second grade, teacher and doctor reports prompted a psychological screening. (Tr. 195).  The screening revealed that R.L.'s teacher reported subjective concerns, which were within the clinical range for inattentive and hyperactive behavior problems and within the borderline range for aggressive and rule-breaking behaviors. (Tr. 196).  Further evaluation by a mental health professional was recommended. (*Id.*).

On February 22, 2010, R.L. began treating with Rim Said, M.D. (Tr. 204-08).  R.L. had a history of hyperactivity, causing disruption in the classroom, being unable to maintain attention, impulsivity, and struggling with math. (Tr. 204-05).  During the examination, R.L. was noisy and forgot questions when asked, but was also cooperative and had an organized thought process. (Tr. 207).  Dr. Said diagnosed ADHD and assigned a Global Assessment of Functioning

("GAF") score of 50, representing serious symptoms. (Tr. 207).  The doctor prescribed Adderall and counseling, and suggested that Plaintiff request an IEP through R.L.'s school. (Tr. 208).

On April 6, 2010, Plaintiff initiated a request for assistance with the child's school. (Tr. 165-69).  Plaintiff requested additional support because R.L. had a difficult time keeping up in class, was recently diagnosed with ADHD, and took Adderall.  (Tr. 165).  One of R.L.'s teachers completed a portion of the request.  The teacher wrote that during most of the year, R.L. had difficulty settling down and paying attention, but for the past two months, presumably the period during which the child was taking Adderall, he was more focused and would volunteer to sit with her to understand an idea or activity. (*Id.*).  She opined that R.L. needed to improve his fluency and sometimes had trouble saying what he meant. (Tr. 167).  R.L. participated in whole class instruction, one-on-one instruction in all subject areas, and small group work in reading. (*Id.*). The teacher further indicated that behavior problems interfered with R.L.'s ability to take in information and seriously affected his performance, though there was presently an improvement in the child's behavior. (Tr. 168).

An April 26, 2010 psychiatric progress note indicated that R.L. had run out of Adderall for two weeks. (Tr. 202).  Plaintiff thought that R.L. was developing a tic in his neck due to the medication; however, R.L.'s behavior had otherwise improved.  Plaintiff also indicated the child's school called because he was being physically aggressive. (*Id.*).  Adderall was continued and R.L. was to be monitored to determine whether the drug caused a motor tic. (Tr. 203).

In May 2010, Dr. Said recounted that R.L. was doing much better in school. (Tr. 242). Teachers had reported that his grades, learning, and behavior had improved remarkably. (*Id.*). But because R.L. had developed a motor tic, Dr. Said discontinued Adderall and prescribed Clonidine to treat the unwanted side effect. (Tr. 242-43).

During May 2010, Ouimet Smith, assistant principal at R.L.'s school, wrote a letter regarding the child's conduct over the course of the school year. (Tr. 164). Mr. Smith explained that there had been six to eight physical incidents with R.L., most of which occurred at recess. Usually R.L. was involved in appropriate play that went wrong due to a choice he or a peer made, and he chose to retaliate. (*Id.*).

In June 2010, Belvia Martin, Ph.D., completed a Teacher Questionnaire. (Tr. 148-55). She was R.L.'s teacher for multiple subjects for the second grade school year, which spanned from 2009 to 2010. (Tr. 148). Ms. Martin indicated that R.L. displayed "very serious problems" related to nearly every skill under the domain of acquiring and using information. (Tr. 149). She explained that R.L. had great difficulty sitting sill, paying attention, and focusing. (*Id.*). In the domain of interacting and relating with others, Ms. Martin identified mostly "obvious problems," with "very serious problems" in introducing relevant and appropriate topics of conversation, and using vocabulary and grammar to express thoughts in everyday conversation. (Tr. 151). Ms. Martin further opined that R.L.'s altercations with other students occurred mostly during less structured parts of the school day, like gym and recess. (*Id.*). R.L. had trouble settling down and was overly-excited when interacting with others. (Tr. 154). Ms. Martin commented that when R.L. took Adderall, he was calm, focused, and sought her out to explain concepts, but the medication was ceased due to side effects. (*Id.*).

R.L.'s second grade report card showed that in various skill areas related to reading, writing, and primarily mathematics, R.L. required more practice to meet objectives. (Tr. 156). R.L. also needed to improve his work and study habits. (Tr. 157). Otherwise, R.L. was generally progressing toward objectives as expected. A teacher note indicated that R.L. had a difficult time sitting down and focusing, but that he had become a better reader and writer over the course

4

of the year and grew a great deal in math. The child was more willing to learn, and his teacher encouraged him to enroll in a summer program to bring his skills up to grade level. (*Id.*). Additionally, a math concepts and skills summary showed that R.L. had mastered 98 percent of required skills and was at a course level of "2.41." (Tr. 293).

In a June 17, 2010 psychiatric session, Plaintiff reported that R.L.'s behavior was hyperactive and inattentive after discontinuing Adderall. (Tr. 240). Nevertheless, upon examination, R.L. was awake, alert, and oriented; his thought process was linear, concise, and logical; he was euthymic; his cognition was good; his insight and judgment were age appropriate; and he was calm and cooperative. (*Id.*). R.L. was prescribed Concerta for ADHD and continued on Clonidine. (Tr. 241).

On July 22, 2010, state agency examiner Joseph Konieczny, Ph.D., performed a psychiatric evaluation of R.L. (Tr. 244-47). Dr. Konieczny noted R.L.'s diagnosis of ADHD. Plaintiff reported that when R.L. was not on medication, he was hyperactive, restless, and aggressive; however, medication alleviated these symptoms. (Tr. 245). At the time of the examination, Plaintiff indicated that R.L. had taken his medication. (*Id.*). R.L. was physically aggressive with his siblings at home. During the previous school year, R.L. was involved in some behavioral acting out, but was not suspended or sent home. R.L. had received average to below average grades. R.L.'s school was evaluating the potential for special education programming; the child had no previous history of special education involvement and had not repeated any grades. (*Id.*).

Upon examination, Dr. Konieczny observed that R.L. related pleasantly and was cooperative, responding readily to all questions and tasks posed. R.L. appeared somewhat restless, but Dr. Konieczny opined that the restlessness appeared age appropriate. Dr. Konieczny

5

observed no significant symptoms of hyperactivity, restlessness, or inattentiveness. R.L.'s speech was adequate for his age, he showed no indications of mood disturbances, and did not display diminished tolerance for frustration. No speech or articulation difficulties were apparent. (*Id.*).

Dr. Konieczny also administered intellectual testing. On the Wechsler Intelligence Scale for Children-IV (WISC), R.L.'s full scale IQ placed in him the low-average to borderline range of intellectual functioning. (Tr. 246). On the Wide Range Achievement Test-4 (WRAT), R.L.'s scores were in the low-average to average range, and were slightly higher than anticipated, given his IQ score. (*Id.*).

Dr. Konieczny diagnosed ADHD, predominantly hyperactive–impulsive type, in partial remission. (Tr. 246). The doctor also diagnosed a nonverbal learning disorder. Regarding intellectual functioning, the doctor offered no diagnosis. He explained that results of intellectual testing placed R.L.'s capabilities in a range that could suggest a diagnosis of borderline intellectual functioning, but several of the child's capabilities and areas of academic achievement extended beyond that which would be considered for an individual with such a diagnosis. The doctor assigned a GAF score of symptom severity of 68, reflecting mild symptoms, and of functional severity of 60, reflecting moderate symptoms. (*Id.*).

On July 31, 2010, state agency consultative physician Caroline Lewin, Ph.D., conducted a review of the record. (Tr. 250-55). She opined that R.L.'s impairments did not functionally equal a listed impairment. More specifically, Dr. Lewin found no limitation in the domain of acquiring and using information, and a less than marked limitation in the domain of interacting and relating with others. (Tr. 252).

On September 9, 2010, a psychiatric progress note indicated that R.L. was not experiencing tics on Concerta. (Tr. 225). While R.L. still had some problems focusing at school,

medication helped with hyperactivity.  Providers continued R.L.'s current treatment regime because he was doing well. (*Id.*).

In November 2010, Kathryn Bartow, MA, CCC/SLP, performed a speech and language evaluation at the direction of the state agency. (Tr. 256-59).  Ms. Bartow found that 80 to 100 percent of R.L.'s speech was intelligible. (Tr. 256).  His articulation scores indicated his skills to be within normal limits (Tr. 258).  However, Ms. Bartow explained that R.L. had difficulty completing the test, and it appeared that he had difficulty seeing.  R.L. was not wearing his glasses that day. (*Id.*).  Ms. Bartow opined that R.L. could benefit from further speech testing, as his vision may have played a role in the test results, but regardless of his vision, R.L. exhibited several examples of word finding difficulties. (Tr. 258-59).  Ms. Bartow concluded that R.L. displayed a severe core, receptive, and expressive language delay. (Tr. 258).  R.L.'s prognosis for improvement was good, given a consistent focus on language development through speech therapy services. (Tr. 259).

Around December 6, 2010, state agency consultative physicians reviewed an updated version of the record. (Tr. 260-65).  They opined that R.L.'s impairments did not functionally equal the listing. (Tr. 260).  Unlike Dr. Lewin, they found that the child exhibited a marked limitation in acquiring and using information. (Tr. 262).  They agreed, however, that R.L. exhibited a less than marked limitation in interacting and relating with others. (*Id.*).

On March 24, 2011, Plaintiff reported that R.L. was doing "okay." (Tr. 268-69).  R.L. had run out of his medication for months, and was bullying others in school, not listening, and not completing his homework. (Tr. 268).  R.L. was restarted on Concerta. (Tr. 269).

In April 2011, R.L.'s school performed an initial review for Section 504 plan eligibility. (Tr. 277-78).  The report recounted that R.L. had received tutoring for reading from the first

through the third grades. (Tr. 277). Teachers noted R.L.'s difficulty listening effectively, following directions and rules, organizing his time, and staying on task. However, they enjoyed having R.L. in class and believed he wished to succeed. (*Id.*). R.L. took Concerta for ADHD, which had a positive effect on hyperactivity, though the school reported a continued concern with the child's ability to focus in class. (*Id.*). A Section 504 plan was implemented, giving R.L. special accommodations, which included small group settings for tests and quizzes, extended time for assignments and tests, preferential seating, a focus on keeping his behavior on-task, and the option of going to a quiet area to complete work. (Tr. 273).

During April 2011, R.L. was suspended twice for fighting, missing three days of school as a result. (Tr. 307, 309). R.L.'s spring 2011 third grade progress report indicated that the child could retell what he read and was working hard to improve fluency. (Tr. 301). He met with a reading tutor five days per week, for 30 minutes sessions. (*Id.*). R.L. struggled when writing about what he read, because he had difficulty slowing down and checking his work for errors. (*Id.*).

R.L.'s report card for the 2010-2011 school year showed that in his final semester, he was progressing toward objectives as expected in the significant majority of his coursework, including reading, math, and science. (Tr. 316-17). While there were some areas where R.L. needed more practice to meet objectives, there were others in which he consistently achieved objectives. (*Id.*).

On November 10, 2011, R.L. presented to Sylvester Smarty, M.D. (Tr. 267). R.L. had not taken his ADHD medication since the summer, because it had run out. (Tr. 266). As a result, R.L. was not doing well in school, paying attention, finishing his work, or sitting still. At home, the child was somewhat oppositional, refused to do work, and argued with his brother. Upon

examination, R.L.'s thought process was linear, concise and logical; he was euthymic, calm and cooperative; and had good cognition and judgment. (*Id.*). Dr. Smarty restarted Concerta and added melatonin to improve R.L.'s sleep. (Tr. 267).

Francine Hammer, R.L.'s fourth grade teacher, authored a letter on November 21, 2011. (Tr. 162). Ms. Hammer described R.L. as friendly and one who tries to please. He worked well in small group instruction, such as guided reading and math groups. However, Ms. Hammer opined that R.L. had difficulty working independently and in a whole group setting. The child also had trouble staying on-task and required a lot of support. He was not at grade level in math, had difficulty following multi-step directions, and often needed to be re-directed. Ms. Hammer purported that R.L. was very social and well-liked by other students. (*Id.*).

In December 2011, Dr. Smarty completed a functional equivalence questionnaire. (Tr. 327-30). Dr. Smarty had known R.L. since June 2010. (Tr. 327). He assessed extreme limitations in the domains of acquiring and using information, and interacting and relating with others. (Tr. 327-28). Dr. Smarty stated that R.L. had a Section 504 plan, which allowed for extra time to complete school work. (Tr. 329).

## IV. SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on June 1, 2002. Therefore, he was a school-age child on May 4, 2010, the date the application was filed, and is currently a school-age child.

2. The claimant has not engaged in substantial gainful activity since May 4, 2010, the application date.

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD) and a severe expressive and receptive delay.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

9

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since May 4, 2010, the date the application was filed.

(Tr. 14-27) (internal citations omitted).

## V. STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i). Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the child claimant is working. If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings. The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings. These domains include:

(1) Acquiring and using information;

10

>(2) Attending and completing tasks;
>(3) Interacting and relating with others;
>(4) Moving about and manipulating objects;
>(5) Caring for yourself; and,
>(6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains. 20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

>We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

>We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record. 20 C.F.R. § 416.927. A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions. *Id*. The ALJ must also account for the opinions

11

of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record. 20 C.F.R. § 416.927(e)(2)(i-ii). Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age. 20 C.F.R. § 416.926a(b)(3)(i-ii).

## VI. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion. The Commissioner's decision, if supported by substantial evidence, must stand. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the

Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VII. ANALYSIS

Plaintiff raises two primary allegations of error. First, she maintains that the ALJ erred in failing to discuss whether R.L.'s learning disability constituted a severe impairment at step two of the sequential evaluation. Additionally, she asserts that the ALJ ought to have found that R.L.'s impairments functionally equaled listing level, rendering him disabled. The merits of these allegations will be addressed in turn.

### A. The ALJ's step two finding

Plaintiff asserts that the ALJ's finding at step two is flawed, because the ALJ did not expressly determine whether R.L.'s learning disability qualified as a severe impairment. She points to Dr. Konieczny's diagnosis of a learning disability, as well as the results of intellectual testing, in support of her argument that R.L.'s learning disability ought to have been deemed a severe impairment.

The second step in the sequential analysis, determining whether a claimant suffers from any severe impairment, is used as a screening tool, permitting ALJs to dismiss "totally groundless" claims from a medical standpoint at an early stage in the analysis. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). At this step, the claimant must show that he has an impairment which significantly interferes with his ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c); 416.920(c). The ALJ's ruling here is viewed under a *de minimis* standard. *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Childrey v. Chater*, 91 F.3d 143 (6th Cir. 1996) (Table). Accordingly, a claimant's impairment will only be construed as non-severe when it is a "slight abnormality which has such a minimal

effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education and work experience." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985) (*citing Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

An ALJ's failure to properly name one of a claimant's impairments as severe will not always constitute reversible error. Remand is not necessary, so long as the ALJ finds the claimant to suffer from at least one severe impairment and continues to evaluate both the claimant's severe and non-severe impairments at the latter stages of the sequential analysis. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) ("And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does 'not constitute reversible error.'") (*citing Maziarz*, 837 F.2d at 244).

At step two of the sequential analysis in R.L.'s case, the ALJ failed to discuss whether R.L. suffered from a learning disorder that constituted a severe impairment. (Tr. 14). The ALJ did not include a learning disorder among the other severe impairments listed, and in doing so, it appears that the ALJ implicitly indicated that such disorder was not a severe impairment in R.L.'s case. (*Id.*).

While it would have been helpful for the ALJ to provide further elaboration at step two, particularly given Dr. Konieczny's diagnosis, the ALJ's omission is harmless. The ALJ concluded that R.L. suffered from two severe impairments: ADHD and a severe expressive and receptive delay. (Tr. 14). During the remaining steps of the disability analysis, the ALJ went on to evaluate all of R.L.'s impairments, severe and non-severe. Included in this later discussion

were Dr. Konieczny's diagnosis of a learning disorder and the results of R.L.'s intelligence tests, including those test results speaking to R.L.'s perceptual reasoning and processing abilities, which Plaintiff purports the ALJ failed to adequately address. (Tr. 18-19).  Moreover, as the Commissioner asserts, in addition to Dr. Konieczny's diagnosis and intelligence testing, the ALJ considered R.L.'s cognitive, language, and behavioral abilities and limitations at the remaining steps of disability determination, regardless of the diagnostic labels applied.  Overall, the opinion sufficiently shows that the ALJ considered the learning disorder and related evidence, though he failed to elaborate on such at step two.  As a result, the ALJ's error in this regard does not necessitate remand.

### B. Functional equivalency

According to Plaintiff, the ALJ erred by finding that R.L. did not functionally equal a listing, because the evidence supports the opposite conclusion.  Plaintiff alleges that, contrary to the ALJ's determination, there exists substantial evidence in the record showing that R.L. has marked limitations in two domains: acquiring and using information and interacting and relating with others.

#### 1. Acquiring and using information

The domain of acquiring and using information considers how well the claimant learns information and how well the claimant uses the information learned. 20 C.F.R. § 416.926a(g). Examples of limited functioning in this domain include:  being unable to understand words about space, size, or time; having difficulty recalling important things learned in school yesterday; having difficulty solving mathematics questions or computing arithmetic answers; talking only in short, simple sentences, and having difficulty explaining what you mean. 20 C.F.R. § 416.926a(g)(3).

Here, the ALJ found that R.L. exhibited a less than marked limitation in the domain. Plaintiff points to various pieces of evidence to counter the ALJ's conclusion, including an opinion issued by state agency reviewing consultants around December 2010. (Tr. 261-65). The consultants opined that R.L. was markedly limited in acquiring and using information. (Tr. 262). The ALJ awarded "great weight" to the opinion, but failed to credit the finding of a marked impairment. (Tr. 21). It is difficult to reconcile the ALJ's valuation of the state agency opinion with his rejection of their finding of a marked impairment, without some explanation from the ALJ. As a result, the ALJ's finding as to the domain is flawed.

Nevertheless, remand on the basis that the ALJ reevaluate his finding as to this domain would be a futile gesture. *See Bollenbacher v. Comm'r of Soc. Sec.*, 621 F. Supp. 2d 497, 502 (N.D. Ohio 2008) (*citing Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006)) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."). Even if the ALJ had fully accepted the state agency opinion, as well as Plaintiff's other arguments that the evidence supports a marked impairment, to conclude that R.L. was markedly limited in this domain, the ALJ's ultimate ruling would not have changed. In order to be deemed disabled, a child claimant must have marked impairments in at least two domains or an extreme impairment in one domain. 20 C.F.R. § 416.926a(d). In the instant case, the ALJ did not find R.L. to suffer from an extreme or a marked limitation in any other domain, and neither did the state agency consultants. The ALJ's opinion as to the remaining five domains, including interacting and relating with others, is supported by substantial evidence as will be further discussed herein. Consequently, if the ALJ had found R.L. to be markedly impaired in acquiring and using information, it would not have sufficed to render the child disabled. *See Meadows ex*

*rel. R.M. v. Comm'r of Soc. Sec. Admin.*, No. 1:12-CV-341, 2013 WL 1337711 (N.D. Ohio Mar. 29, 2013).

Plaintiff does not appear to maintain that the evidence supports an extreme limitation in acquiring and using information. Although Plaintiff points to Dr. Smarty's opinion that R.L. had an extreme limitation in this domain, the ALJ attributed only little weight to the opinion, and Plaintiff does not assert that the ALJ violated the treating physician rule in regard to Dr. Smarty. The ALJ's opinion as a whole demonstrates that the ALJ considered the evidence Plaintiff argues supports a finding of a more serious limitation in the domain and concluded that such evidence did not render the child disabled. Overall, the totality of the ALJ's opinion convinces the Court that it would be futile to remand the case for the ALJ to reevaluate the domain, particularly in light of the state agency consultants' finding of only a marked limitation and Plaintiff's failure to point to sufficient evidence to the contrary.

### 2. Interacting and relating with others

This domain examines how well a child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others and complies with rules. 20 C.F.R. § 416.926a(i). Examples of limitations in this area include: when the child has no close friends, has difficulty playing games or sports with rules, or has difficulty communicating with others or speaking intelligibly. 20 C.F.R. § 416.926a(i)(3)(i-vi). Importantly, "the regulation cautions that just because a person has the limitations described does not mean the person has an extreme or even a marked impairment." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009) (*citing* 20 C.F.R. § 416.926a(h)(3)). Thus, the fact that a claimant's behaviors may coincide with the examples in the regulations does not require a court to overturn the ALJ's finding.

Among other evidence in support a finding of a marked limitation, Plaintiff points to Ms. Martin identifying serious problems in R.L.'s ability to interact with others; a report from the assistant principal that as a second grader, R.L. had various physical incidents with other students; and the two suspensions R.L. received in the third grade for inappropriate conduct. Plaintiff also notes that speech evaluation showed R.L. may have trouble understanding others and using language, and Dr. Smarty identified an extreme limitation in this domain.

Throughout his opinion, the ALJ expressly discussed much of the evidence Plaintiff cites. However, weighing the record as a whole, the ALJ found that R.L.'s limitation in the domain was not as severe as Plaintiff alleges. (Tr. 24). The record substantially supports the ALJ's conclusion. Though R.L. at times struggled with his conduct around his siblings and other students, he nonetheless generally interacted well with adults and often with his peers. (*Id.*). For example, R.L.'s teachers described him as well liked by other students and wanting to please. (Tr. 24, 162). The ALJ noted that teachers had not found R.L.'s conduct necessitated a behavioral modification plan. (Tr. 20). Additionally, during consultative examinations, R.L. related well and was cooperative and pleasant. (Tr. 24, 245, 258). Dr. Smarty's notes also reveal that even without medication, R.L. presented to healthcare providers as calm and cooperative. (Tr. 18, 240). Although R.L. had disciplinary action taken at school due to fighting, the ALJ observed that such action had not continued on a consistent basis. (*Id.*). During the administrative hearing, R.L. testified that he had friends at school, and Plaintiff also reported that the child often spoke with friends on the phone. (Tr. 24, 44, 59). The ALJ acknowledged R.L.'s receptive, expressive language delay, but correctly noted that the evidence did not otherwise appear to show the child had serious difficulty articulating, communicating, or hearing in an age appropriate manner. (Tr. 20). Dr. Konieczny, for example, opined that R.L.'s speech was

adequate for his age, and that R.L. showed no apparent speech or articulation difficulties. (Tr. 18, 245). As to Dr. Smarty, the ALJ attributed little weight to the psychiatrist's opinion, which Plaintiff does not now contest. As a result, the ALJ was not required to accept Dr. Smarty's recommendation of an extreme limitation.

Even if the evidence cited by Plaintiff were sufficient to demonstrate that R.L.'s impairments satisfied the functional equivalency criteria, the relevant question is not whether there is evidence to support a ruling different than that reached by the ALJ. The undersigned must determine whether the substantial evidence in the record supports the ALJ's decision. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). If such support exists, the undersigned must affirm the ALJ's determination. *Id.* Overall, there is some evidence in the record showing that R.L. had trouble interacting with peers, but substantial evidence supports the ALJ's conclusion that the child was less than markedly limited in this area.

## VI. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh<br>
Kenneth S. McHargh<br>
United States Magistrate Judge

Date: July 29, 2014.